Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DMITRY KRIVENOK, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JOINT STOCK COMPANY KASPI.KZ, MIKHEIL LOMTADZE, and TENGIZ MOSIDZE,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Plaintiff Dmitry Krivenok ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Joint Stock Company Kaspi.kz ("Kaspi.kz", "Kaspi", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Kaspi.kz securities between January 19, 2024 and September 19, 2024 inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Kaspi.kz securities during the Class Period and was economically damaged thereby.

7.      Defendant Kaspi.kz has a subsidiary called Kaspi Bank, which it has described as "one of the largest and systematically important financial institutions in Kazakhstan[.]" Further, Kaspi.kz works in financial services by providing digital applications to users which can be used for purposes such as making purchases and transferring money.

8.      Further, the Company runs a marketplace where customers can purchase products from various merchants. The Company has stated that "[w]e have launched, and continue to develop, mobile, online and Kaspi QR technology to enable a seamless online and in-store shopping experience for our customers." Further, "[w]e believe that our Marketplace Platform appeals to buyers who value ease of use, a large selection of the most popular products and price competitiveness."

9.      The Company is incorporated in Kazakhstan and its principal executive offices are located at 154A Nauryzbai Batyr Street, Almaty, 050013, Kazakhstan. Kaspi.kz's American Depositary Shares ("ADS" or "ADSs") trade on the NASDAQ Exchange under the ticker symbol "KSPI".

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

10.     Prior to its listing on the NASDAQ, Kaspi.kz also offered securities on the London Stock Exchange.

11.     Defendant Mikheil Lomtadze ("Lomtadze") served as the Company's Chief Executive Officer ("CEO") throughout the Class Period and co-founded the Company.

12.     Defendant Tengiz Mosidze ("Mosidze") served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

13.     Defendants Lomtadze and Mosidze are collectively referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law

principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Kaspi.kz under *respondeat superior* and agency principles.

17.    Defendant Kaspi.kz and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

18.    On January 19, 2024, the Company filed with the SEC a prospectus on Form 424B4 in connection with its initial public offering on the NASDAQ exchange (the "Prospectus").

19.    The Prospectus contained the following risk disclosure:
**Our platforms may be used for fraudulent, illegal or improper purposes.**

Despite measures we have taken and continue to take, **our platforms remain susceptible to potentially illegal or improper uses. These may include use of our platforms (in particular, Payments or Marketplace) in connection with fraudulent or counterfeited sales of goods or bank fraud, which are becoming increasingly sophisticated**. There can be no assurance that measures implemented by us, which are aimed **at preventing our business from being used as a vehicle for money laundering, fraud or other illegal activities**, will effectively identify, monitor and manage these risks, and that no incidents of fraud or other illegal activities will occur in the future. We cannot monitor with absolute certainty the sources of customers' or counterparties' funds or the ways in which they use them. In addition, an increase in fraudulent transactions could harm our reputation and reduce customer confidence in the use of our platforms or lead to regulatory intervention, which could require us to take steps to reduce fraud risk leading to an increase in our costs.

In addition, we may be subject to allegations and lawsuits claiming that items listed on our Marketplace Platform are pirated, counterfeit or illegal.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

The measures adopted by us to verify the authenticity of products sold on our Marketplace Platform and minimize the risk of any potential infringement of third-party intellectual property rights may not be successful. For example, in order for a merchant to become a participant of our Marketplace Platform, we and the merchant sign an agreement whereby the merchant accepts the rules of our Marketplace Platform and represents to us that any product sold through our Marketplace Platform has been certified for sale by applicable laws. ***While we generally do not act as seller, we may become subject to allegations of civil or criminal liability for unlawful activities carried out by third parties through our Marketplace Platform***. In the event that alleged counterfeit, infringing or pirated products are listed or sold on our platforms, we could face claims for such listings, sales or alleged infringement or for the failure to act in a timely or effective manner to restrict or limit such sales or infringement. A merchant whose content is removed or services are suspended or terminated, regardless of our compliance with the applicable laws, may dispute our actions and commence an action against us for damages based on breach of contract or other causes of action or may make public complaints or allegations against us.

***Continued public perception that counterfeit or pirated items are commonplace on our Marketplace Platform***, perceived delays in the removal of these items, even if factually incorrect, or an increase in fraudulent transactions on our platforms could damage our reputation, reduce consumer confidence in the use of our platforms, result in lower list prices for goods sold through our Marketplace Platform and have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added).

20.    The statement in ¶ 19 was materially false and misleading at the time it was made because the Company's platforms were already being used for unlawful purposes, including assisting Russians with evading sanctions in the wake of the 2022 Russian invasion of Ukraine. The Company did this by offering Russian citizens financial services and offering Russian merchants the opportunity to sell goods on the Company's marketplace platform.

21.    The Prospectus contained the following risk disclosure:

***We are exposed to the risk of inadvertently violating anti-corruption, anti-bribery, anti-money laundering, sanctions and other similar laws and regulations of Kazakhstan and other jurisdictions, and our current risk management and compliance systems may prove ineffective.***

Kazakhstan financial institutions, including Kaspi Bank, are obliged to monitor certain transactions entered into by their clients by conducting due diligence, as set out under the applicable laws, with respect to the clients and the relevant transactions. If it is not possible to conduct such due diligence, the financial institution must prevent the clients from entering into any such transaction. Kazakhstan law requires any suspicious transaction to be reported to an authorized state body immediately, and, in any case, before such suspicious transaction is processed.

We have also implemented measures aimed at preventing our platforms from being used as a vehicle for money laundering, including "know-your-client" policies and the adoption of anti-money laundering and compliance procedures in all of our branches and banking outlets. Our responsibility unit seeks to prevent money laundering and terrorist financing by performing, among other things, the following functions:

- identifying both transactions subject to financial monitoring and suspicious transactions and reporting such transactions to the authorized state body;
- ***developing and improving policies, rules and other internal documents aimed at preventing the laundering of proceeds of crime and the financing of illicit activity (including terrorism);***
- ***developing risk assessment criteria to assess our customers from a money laundering perspective***;
- implementing anti-money laundering training sessions for our employees and discussing our anti-money laundering procedures with employees;
- participating in the preparation of a database of information aimed at preventing us from engaging in transactions related to the financing of terrorism, in accordance with a list of terrorists and terrorist organizations provided to us by the relevant authorities; and
- maintaining an electronic database containing a list of our suspicious customers.

6

Currently, we comply with our existing policies, rules of internal control and with the requirements of all applicable laws. However, there can be no assurance that attempts to launder money or finance illicit activity through us will not be made or that anti-money laundering measures implemented by us will always be effective. If we were associated with money laundering, even if this is solely due to the failure of our anti-money laundering measures, or if we were unable to comply with all of the relevant laws and internal policies regarding financial assistance or money laundering, we could be subject to significant fines, as well as harm to our reputation, and our business, financial condition and results of operations may be materially adversely affected.

***In addition, we comply with applicable U.S., EU and UK economic and trade sanctions***, including those administered and enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, the U.S. Department of Commerce, the Office of Financial Sanctions Implementation of His Majesty's Treasury and the Foreign, Commonwealth & Development Office of the United Kingdom, the United Nations Security Council and other relevant authorities. ***Our operations expose us to the risk of violating, or being accused of violating, economic and trade sanctions or engaging in conduct that may create a risk of the imposition of secondary sanctions. We do not currently have contracts or transactions with persons or entities that are targets of U.S. blocking or other applicable sanctions***, such as parties included in the Specially Designated Nationals and Blocked Persons List maintained by OFAC, or similar sanctions-related lists of designated persons maintained by EU, UK and other relevant sanctions authorities. However, any failure to timely and accurately screen our contracts and transactions may expose us to secondary sanctions, reputational harm and significant penalties, including civil and criminal fines, and even investigations of alleged violations can be expensive and disruptive. In addition, despite our adoption of sanctions screening procedures and compliance policies, there can be no assurance that through these procedures and policies we will timely and effectively detect all sanctioned business partners or contractual counterparties, including as a result of new sanctions designations, nor achieve full compliance by all of our employees or representatives for which we may be held responsible, and any such failure or violation could have a material adverse effect on our business, financial condition and results of operations.

7

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(Emphasis added).

22.    The statement in ¶ 21 was materially false and misleading at the time it was made because the Company did not comply with applicable U.S., EU and UK economic trade sanctions. The Company continued to do business with Russian entities and provide services to Russian citizens after the Russian invasion of Ukraine in 2022, exposing it to the risk of secondary sanctions.

23.    The Prospectus contained the following risk disclosure:
***We are largely dependent on the economic, social and political conditions prevailing in Kazakhstan.***

\*      \*      \*

International geopolitical tensions may also impact our business and operations. The Russian invasion of Ukraine has led to disruptions in economic and business activity in Europe and elsewhere, although to date changes in the operating environment caused by the geopolitical situation have had an insignificant and limited impact on our operations. We have limited exposure to Ukraine mostly through our subsidiary, Portmone Group, which represented 0.1% of our total assets as of December 31, 2022 and 0.06% of our net income for the year ended December 31, 2022. Portmone Group continues to operate in the normal course of its business. ***Our business does not have any exposure to Russia or Russian businesses***.

(Emphasis added).

24.    The statement in ¶ 23 was materially false and misleading at the time it was made because the Company had exposure to Russia and Russian businesses by virtue of allowing Russians to use its financial service products, allowing Russian merchants to sell goods on its marketplace, and ordering goods (such as lockers) that were made by a Russian company, among other relationships with Russian businesses.

25.    The Prospectus stated, in pertinent part, the following regarding related party transactions:

8

***Since January 1, 2020 and up to the date of this prospectus***, we have entered into a number of transactions with related parties in the ordinary course of business.

## Kolesa

We are party to various agreements with Kolesa, the largest car and real estate classifieds platform in Kazakhstan. Mr. Mikheil Lomtadze, the chairman of our management board, our chief executive officer, a member of our board of directors and our significant shareholder, is a significant shareholder of Kolesa, and Mr. Yuri Didenko, deputy chairman of the management board, is the chairman of the board of directors of Kolesa. Under these agreements, we pay fees to Kolesa for car loans generated on Kolesa's car classifieds platform and Kolesa pays to us fees for acquiring services and account-related fees. For the nine months ended September 30, 2023 and the years ended December 31, 2022, 2021 and 2020, our payments to Kolesa under such arrangements amounted to ₸4,853 million, ₸4,862 million, ₸10,981 million and ₸12,527 million, respectively. For the nine months ended September 30, 2023 and the years ended December 31, 2022, 2021 and 2020, Kolesa's payments to us amounted to ₸31 million, ₸16 million, ₸7 million and ₸3 million, respectively.

On July 21, 2023, we entered into an agreement with an indirect subsidiary of Baring Vostok Private Equity Fund V to acquire 39.758% of the shares of Kolesa for $88.5 million. The transaction was completed in October 2023. In October 2023, Mr. Mikheil Lomtadze, the chairman of our management board, our chief executive officer, a member of our board of directors and our significant shareholder, who is also a significant shareholder of Kolesa, transferred 11% of the shares of Kolesa to us in trust, for no consideration, under a trust management agreement, which enabled us to hold approximately 51% of the voting rights in Kolesa and gave us control over the board of directors of Kolesa. We expect to consolidate Kolesa's results of operations in our consolidated financial statements on the basis of control under IFRS 10.

## Magnum

***We are party to various agreements with Magnum, the largest retail food chain in Kazakhstan. Mr. Vyacheslav Kim, the chairman of our board of directors and a significant shareholder, is the beneficial owner of a***

9

*controlling stake in Magnum*. Under these agreements, we pay rent to Magnum for placing our ATMs and payment kiosks on Magnum's retail premises, and Magnum pays to us fees for the provision of QR and acquiring services and fees for sales made through m-Commerce and, previously, e-Commerce businesses of our Marketplace Platform.

For the nine months ended September 30, 2023 and the years ended December 31, 2022, 2021 and 2020, our payments to Magnum amounted to ₸141 million, ₸84 million, ₸50 million and ₸53 million, respectively. For the nine months ended September 30, 2023 and the years ended December 31, 2022, 2021 and 2020, Magnum's payments to us, other than finance lease payments set out below, amounted to ₸2,964 million, ₸3,780 million, ₸3,062 million and ₸1,250 million, respectively.

Two commercial properties owned by the subsidiary of Kaspi Bank are leased to Magnum under finance leases maturing in 2027. Legal title to these properties will be transferred to Magnum upon maturity of each lease schedule. For the nine months ended September 30, 2023 and the years ended December 31, 2022, 2021 and 2020, Magnum's payments to us under such finance leases amounted to ₸199 million, ₸311 million, ₸358 million and ₸129 million, respectively.

In February 2023, we acquired a 90.01% share in Magnum E-commerce Kazakhstan, a company through which we operate our e-Grocery business, with an investment of ₸70 billion in its share capital. Prior to our acquisition, Magnum E-commerce Kazakhstan was a wholly-owned subsidiary of Magnum, who retains a 9.99% share in the company.

Magnum E-commerce Kazakhstan rents multiple commercial properties from Magnum. Aggregate rent payments for such properties were ₸305 million for the nine months ended September 30, 2023. In addition, in June 2023, Magnum E-commerce Kazakhstan acquired from Magnum a commercial property to use as a dark store for our e-Grocery business for ₸4,779 million.

Due to the substantial bargaining power of Magnum with suppliers, Magnum E-commerce Kazakhstan purchases certain of its goods for sale from Magnum on terms better than Magnum E-commerce Kazakhstan could otherwise obtain directly from suppliers. For the nine months ended

10

September 30, 2023, the total purchase price of goods sold by Magnum to Magnum E-commerce Kazakhstan was ₸2,507 million.

(Emphasis added).

26.    The statement in ¶ 25 was materially false and misleading at the time it was made. Specifically, the statement understated the extent of the Company's links with Magnum, considering that the Vyacheslav Kim, the Company's chairman, has a daughter who is affiliated with the venture.

27.    Further, by only reporting related party transactions that had been entered into since January 1, 2020, the Company gave the impression that it did not have any further related party transactions. This was not the case. In 2015, Chairman Vyacheslav Kim purchased Alseco JSC ("Alseco") from an oligarch who was affiliated with a former dictator of Kazakhstan, and is now convicted criminal. Further, the Company's Deputy Chairman of its management board, Yuri Didenko, is reported to have been Chairman of Alseco.

28.    In the Prospectus, the Company stated that "[s]ince 2021, we have operated the payments platform Portmone in Ukraine. Although the business is small, ***Portmone's payment license gives us the ability to launch other payments and related products, when the geopolitical situation stabilizes***." It further stated that "[w]e have limited exposure ***to Ukraine mostly through our subsidiary, Portmone Group***, which represented 0.1% of our total assets as of December 31, 2022 and 0.06% of our net income for the year ended December 31, 2022." The company also stated that "Portmone Group is a payments company incorporated in Ukraine and acquired by us in October 2021." (Emphasis added).

29.    The statements in ¶ 28 were materially misleading because the Company has possible legal exposure as a result of its acquisition of Portmone. Portmone's administrator has links to a known from for Russian organized crime figures and sanctioned oligarchs, including an oligarch wanted by the FBI for

11

"weapons trafficking, contract murders, extortion, drug trafficking, and prostitution on an international scale."

30.    Further, the statement that Portmone's payment license gave the company the ability "to launch other payments and related products, when the geopolitical situation stabilizes." This statement was false omitted that Portmone had intended to partner with a Ukrainian bank called Concordbank, but that those plans fell through when the Ukrainian government revoked Concordbank's banking license and liquidated its assets as a result of the bank "failing to take adequate countermeasures to prevent money laundering and terrorist financing."

31.    On April 29, 2024, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were signed certifications pursuant the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lomtadze and Mosidze attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

32.    The 2023 Annual Report contained an identical statement to the one contained in ¶ 21.

33.    As such, the statement in ¶ 32 was false for the reasons discussed in ¶ 22.

34.    Further the Company understated the extent of money laundering happening on the Company's platform, considering that the nephew of Nursultan Nazarbayev, the autocratic President of Kazakhstan from 1991 to 2019, and a former 30% shareholder of the Company, had pled guilty to laundering money through Kaspi.kz bank accounts, and then used the laundered funds to purchase properties in Russia.

35.    The 2023 Annual Report contained an identical statement to the one contained in ¶ 23.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

36.     As such, the statement in ¶ 35 was false for the reasons discussed in ¶ 24.

37.     The 2023 Annual Report contained substantially similar statements to the ones in ¶ 25.

38.     As such, the statements in ¶ 37 were materially false and misleading for the reasons discussed in ¶ 26 and 27.

39.     The 2023 Annual Report contained substantially similar statements to the ones in ¶ 28.

40.     As such, the statements referenced in ¶ 39 were materially false and misleading for the reasons discussed in ¶¶ 29-30.

41.     The statements contained in ¶¶ 19, 21, 23, 25, 28, 32, 35, 37, and 39 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Joint Stock Company Kaspi.kz continued doing business with Russian entities, and also providing services to Russian citizens, after Russia's 2022 invasion of Ukraine, thereby exposing the Company to the undisclosed risk of sanctions; (2) the Company engaged in undisclosed related party transactions; (3) certain of the Company's executives have links to reputed criminals; and (4) as a result, Defendants' statements about Joint Stock Company Kaspi.kz's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

42.    On September 19, 2024, Culper Research ("Culper") issued a report entitled "Kaspi.kz (KSPI): The NASDAQ-Listed Fintech Moving Money for Criminals and Kleptocrats" (the "Report").

43.    In the Report, Culper announced the following:

> We are short Kaspi, the operator of the largest payment network and second largest bank in Kazakhstan. **We believe Kaspi has systematically misled U.S. investors and regulators in its repeated claims – especially ahead of the Company's January 2024 NASDAQ listing – that the Company has zero exposure to Russia**. Our research exposes this grave deception: we believe that not only do Kaspi's relationships with Russian partners **permeate every segment of its business, but that in the wake of Russia's February 2022 invasion of Ukraine and into 202, Russia has contributed materially to Kaspi's reported growth**. Our research further unmasks Kaspi's history of shadowy dealmaking, which raises not only related party and self-dealing concerns, but also exposes the Company's vast, longstanding ties to bad actors including sanctioned oligarchs and Russian mobsters. We believe Kaspi's premium valuation and US listing are at risk, and shares are headed lower.

(Emphasis added).

44.    The Report stated the following, as background, regarding western sanctions against Russia after its 2022 invasion of Ukraine, and the implications for the Company:

> In the aftermath of Western sanctions on Russian banks following Russia's February 2022 invasion of Ukraine, millions of Russians fled to neighboring Kazakhstan to open bank accounts and payment cards issued by non-sanctioned banks.

45.    The Report provided the following background about the role of Kazakhstan in Russian sanctions avoidance since the 2022 full-scale invasion of Ukraine:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

In February 2022, Russia invaded Ukraine in the largest escalation of conflict between the two nations since 2014. Sanctions against Russia followed from nations around the world, including the US, leading millions of Russians to flee to neighboring countries, including Kazakhstan, to open international bank accounts and payment cards, hence avoiding the impact of sanctions. Observers even dubbed this behavior "card tourism" and travel agencies offer packages catered to this newfound client base. The Central Bank of Kazakhstan noted in its 2022 financial stability report that over 50% of total new cards issued in Kazakhstan in the year were issued in the months of June and July (amid escalating sanctions), which the central bank said "*may be associated with the phenomenon of 'card tourism' caused by demand from Russian citizens*." The report further called out "*the increase in supply and demand [for rubles] on the part of Russian and Belarusian citizens who opened accounts at Kazakh banks in 2022*" and even noted that **non-residents share of current and card accounts over 6x'ed from 3.4% to 21.3%**. Moreover, numerous groups have called out the sanctions evasion and criminal activity that has resulted.

(Alterations, bolding, and italicization in original).

46.     The Report mentioned the following pertinent studies of sanctions evasion and criminal activity in Kazakhstan as a result of Russia's 2022 invasion of Ukraine:

- In October 2023, the National Bank of Kazakhstan proposed legislation to restrict debit card tourism, but the act appears to have never been taken up as it remains open. Kazakh news agencies at the time noted that the legislation was intended to curb, *"the use of cards issued to foreigners in the interests of drug trafficking and gambling. According to the National Bank of the Republic of Kazakhstan, non-residents issue cards online or on the basis of a one-time visit to our country, and then sell them to criminals."*

- Finally, a February 2024 report from the Organized Crime and Corruption Reporting Project (OCCRP) detailed the ways in which goods have continued to make their way to Russia through networks of Kazakh and Belarusian entities, creating *"a severe hold in the sanctions net."*

(Italicization in original).

47.    The Report noted that "monthly survey data provided by the Kazakh central bank shows that non-resident's share of Kazakh bank deposits have not only skyrocketed throughout 2022, but continue to grow throughout 2024", and then displayed the following graph:



48.    In response to aforementioned data showing that the non-resident share of Kazakh bank deposits has "skyrocketed" since 2022, the Report stated that Culper believed that a "***substantial portion of these deposits owe to Kaspi. Consider that while other Kazakh banks sought to limit Russian inflows, Kaspi welcomed them***." (Emphasis added). The Report contrasted Kaspi.kh with Halyk Bank, which was noted as the "largest bank in Kazakhstan at over twice Kaspi's size, by assets", stating that Halyk Bank "divested it Russian subsidiary Moskommertsbank and took a $41 million loss on the sale. The bank also curbed its exposure at the client level."

49.    The Report further stated the following about Kaspi.kz's sanctions risk:

As the US and other nations continue to broaden sanctions against those found to be aiding Russia's wartime economy, we believe Kaspi now risks secondary sanctions. In 2024 alone, three of Russia's most popular money transfer avenues – QIWI, Golden Crown, and the Mir Card – have been shut out by regulators or sanctions, ***while in July 2024, Kaspi conspicuously***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

***amended its partner service agreement for the first time in 4 years***. The
agreement now specified that the Company can suspend operations of those
found to be directly or indirectly under sanctions, while explicitly citing the
Kazakh government's crackdown on "the laundering of proceeds from crime
and the financing of terrorism."

(Emphasis added).

50.     The Report stated the following about how the Company had amended
its terms in July 2024:

In July 2024, Kaspi amended its partner service agreement. The agreement,
which reportedly had not been altered since 2020, now specifically calls out
the Company's ability to suspend or cancel operations of counterparties
directly or indirectly under sanctions or cooperating with sanctioned
persons, seemingly as a result of the Kazakh government's crackdown on
"*the laundering of proceeds from crime and the financing of terrorism…*"

(Italicization in original).

51.     The Report further stated the following regarding Culper's review of
forums based in Russia:

Our review of various Russian forums suggests Kaspi has been their bank of
choice. ***Russians refer to Kaspi, for example, as "the only bank that issues
cards to Russians", citing their ability to get a "card in 10 minutes"*** as
Kaspi reps are "already trained on Russian clients." Others refer to Kaspi as
"a miracle" after sanctions levied against Russian banks. ***One new Kaspi
accountholder complained of long lines at the bank as "we got into a large
wave of people coming from Russia" while another complains of wait
times on account of "the period of excitement for receiving bank cards and
accounts in 2022." Kaspi's official account even replies to these reviews to
thank "our beloved customers" and to instruct Russian clients on how to
exchange their rubles***.

(Emphasis added).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

52.     The Report included the following screenshots of reviews on Yandex, which is a Russian search engine that offers other features (similar to Google), from Russians stating that they were able to do business with Kaspi.kz on Yandex:



53.     The Report further demonstrated that Kaspi.kz even responds to "self-identified Russian citizens" to thank them for their business and at times to provide instructions on things such as exchanging rubles for other currencies:



18



54.    The Report included "numerous comments from Russian forum VC.ru in which users consistently highlight new accounts with Kaspi[.]" Based on the below comments, the Report stated that "Kaspi also appears to be the primary option for Russian business owners."

- *"For example, Kaspi has a correspondent bank in Russia – Raiffeisen . . . If the bank from which you send to the Russian Federation and the correspondent bank are the same, there will be no commission. This is the case of sending from Raiffeisen to Kaspi and BCC."* (Italicization in original). The Report stated that this comment was made on October 24, 2022.
- *"The easiest option is Kaspi. Issued at any branch. 10 minutes to process documents and then in 2 minutes the terminal prints your card in front of you."* (Italicization in original). The Report stated that this comment was made on November 26, 2022.
- *Most migrant chats and blogs on vc.ru recommended Kaspi Bank – essentially, it is the only bank in Kazakhstan that opens cards for non-residents quickly and without unnecessary bureaucracy [. . .]*
- *I went to the nearest Kaspi bank branch, which has a card machine. There, the girls, already trained on Russian clients, immediately gave me a piece of paper with the rules for using the card…. The whole procedure took me no more than 10 minutes…"* The Report stated that this comment was made on April 26, 2023, citing an October 2022 trip.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- *You can send rubles from Russia to a ruble account in Kaspi Gold via the Kaspi.kz correspondent account in Raiffeisenbank (Moscow). Rubles well be automatically converted at the current rate into tenge."* The Report stated that this comment was made on May 4, 2023.
- *I withdraw my salary via Solar Staff to a Russian card. Previously, I transferred money from there to Kaspi via Qiwi Wallet, then it turned out that you can immediately transfer them via Tinkoff [sanctioned Russian Bank] to a Kazakh card."* The Report stated that this comment was made on February 1, 2023.

(Italicization and alterations in original).

55. The Report further stated that "***Kaspi claims it doesn't work with sanctioned Russian banks, but Russians consistently cite their ability to move money through Kaspi's correspondent account at Raiffeisenbank***." (Emphasis added). The Report further stated the following about Raiffeisen:

As an Austrian bank with an arm in Moscow, Raiffeisen initially eluded sanctions, but is now subject to investigations from both the US's OFAC and Austrian regulators related to potential money laundering violations. ***Nevertheless, Kaspi continues to hold a Moscow-based account at Raiffeisen, and we found Kaspi customer service reps instructing Russian accountholders on how to send rubles to Kaspi, as recent as June 2024***.

(Emphasis added).

56. Regarding the above comments, the Report stated that "Kaspi has repeatedly claimed that the Company does not work with sanctioned Russian banks, but – as shown above – ***multiple Kaspi accountholders reference a Kaspi account at Raiffeisen Bank***." (Emphasis added). The Report stated that as an Austrian bank, "Raiffeisen initially avoided sanctions, but ***has since come under fire as its Russian arm has continued to do business. We confirmed that Kaspi continues to work with the Moscow arm of Raiffeisenbank through the Company's own list of correspondent accounts***." (Emphasis added). The Report

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

provided the following screenshot from the list of Kaspi.kz's correspondent accounts:

Список корреспондентских счетов АО "Kaspi Bank"

| № | Наименование банка | SWIFT | Реквизиты банка | Валюта | Номер счета АО "Kaspi Bank" |
|---|---|---|---|---|---|
| 1 | **РАЙФФАЙЗЕНБАНК** МОСКВА, РОССИЯ | RZBMRUMM | № 30101810200000000700 БИК 044525700 | RUB | 30111810000000000079 |

57.    The Report stated that "as recent as June 2024, ***we found Kaspi customer service representatives on popular Russian social media platform VK instructing customers how to send rubles form Russian banks to Kaspi via Raiffeisenbank***," (Emphasis added) and then included the following image:



58.    The Report referenced investigations into Raiffeisen, stating that "[i]n the past 2 years, Raiffeisen has encountered not only increased scrutiny but now faces at least 2 investigations related to money laundering." Further, Culper stated that it believed "this poses a meaningful risk to Kaspi's business, by extension", noting the following investigations into Raiffeisen:

- In February 2023, Reuters reported that the US Treasury Department's OFAC office was investigating Raiffeisen and asked the bank for details regarding its exposure to Russia, as well as the transactions and activity of certain clients.

- In February 2024, the bank disclosed that Austria's financial regulator FMA has been investigating the bank on anti-money-laundering failures.

- In May 2024, the sale of Raiffeisen's Russian unit to Russian oligarch Oleg Deripaska was effectively called off after the US issued a threat of secondary sanctions.

\*       \*       \*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- Finally [. . .] a Russian court froze the shares in Raiffeisen's Russian arm, effectively blocking its potential sale.

59.     In light of the aforementioned data from the Kazakh central bank on nonresident funds as a proportion of domestic bank deposits, its relationship with Raiffeisen, Russians saying that they were able to bank with Kaspi.kz, and the "retreat of competitors like Halyk from the 'non-resident' market," that "***Kaspi has been and continues to be responsible for a substantial portion of non-resident inflows to Kazakh banks since 2021***." (Emphasis added).

60.     The Report further noted that "Kaspi doesn't disclose what portion of its MAUs ["monthly active users"], deposits, or payment volumes are Russian or non-resident, instead avoiding the question entirely by boldly claiming that it has zero exposure to Russia." The Report indicated that this assertion was contradicted by the following:

> Kazakhstan central bank data reveals that from year-end 2021 (i.e. pre-war) through Q2 2024, non-resident deposits in Kazakh banks skyrocketed 338% to 3.3 trillion tenge, and now to 3.9 trillion as of the end of August. We believe that Kaspi has been responsible for a significant share of this growth. ***If 50% of non-resident deposits went to Kaspi accounts, then 29% of Kaspi's deposits and nearly half of the Company's growth since the start of 2022 can be explained by non-residents. Nationwide, non-resident deposit liabilities continue to grow, suggesting to us that Kaspi continues to benefit from Russian inflows***.

(Emphasis added).

61.     The Report stated that "[i]llustratively, if Kaspi took in 50% of all non-resident deposits, <u>**then Kaspi's non-resident deposits would currently make up an astounding 29% of its book and be responsible for 43% of the Company's deposit growth since the start of 2022**</u>." It then included the following graph:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

| Culper Est. Kaspi Nonresident Deposit Growth (millions tenge) | |
|---|---|
| Kaspi net new deposits, 2021 to Q2 2024 | 2,934.3 |
| Non-resident deposits nationwide, year-end 2021 | 763.8 |
| Non-resident deposits nationwide, Q2 2024 | 3,282.9 |
| Net new non-resident deposits nationwide, 2021 to Q2 2024 | 2,519.1 |
| Kaspi share of net new non-resident deposits | 50% |
| Kaspi net new nonresident deposits | 1,259.6 |
| | |
| Kaspi total deposits, year-end 2021 | 2,763.0 |
| Kaspi total deposits, Q2 2024 | 5,697.3 |
| Kaspi net new deposits, 2021 to Q2 2024 | 2,934.3 |
| Non-resident as % of Kaspi total deposit growth | 43% |
| Non-resident as % of Kaspi total deposits, Q2 2024 | 29% |

62.     The Report further stated regarding proof of money laundering through Kaspi:

Then there's the smoking gun. In April 2024, Kairat Satybaldy – former 30% shareholder of Kaspi, a confessed criminal, the nephew of scorned dictator Nazarbayev, and the founder of Iran-backed Muslim political movement Ak-Orda – **pled guilty to laundering hundreds of millions of dollars of criminal proceeds through multiple Kaspi bank accounts, then using the funds to purchase properties in Russia**. This guilty plea in our view re-raises not only questions about Kaspi's shareholder list, but about US listing standards for KSPI shares.

(Underlining and bolding in original).

63.     The Report further stated that "**we are talking about a NASDAQ-listed company that has allowed a former 30% shareholder, admitted "longtime friend" of the Chairman, and criminal to use the bank as a washing machine for hundreds of millions in ill-gotten gains**." (Bolding and underlining in original).

64.     The Report stated the following about Kaspi.kz's marketplace:

Kaspi's exposure to Russia isn't merely in its banking and payments businesses but its marketplace too, which remains open season for Russian buyers, sellers, and suppliers. We found Russian language Telegram groups where marketplace sellers share tips on how to, for example, find Russian suppliers, ship orders to Russia, and pay Russian invoices using Kaspi Pay. *We found a Russian business marketing their goods on Kaspi and advising*

23

***payment through Russia's sanctioned VTB Bank. Finally, we found listings for high-end goods including jewelry of Russian origin***.

(Emphasis added).

65.    The Report further stated that "[Kaspi marketplace remains open to Russian buyers, sellers, suppliers, and goods]." Culper stated that it "looks to us that Kaspi's marketplace remains open season for Russian buyers, sellers, and suppliers. We uncovered multiple Telegram groups dedicated to selling on the Kaspi marketplace in which Russia-based users discuss various tips and tricks of selling on Kaspi."

66.    The Report then included a screenshot where a "[u]ser claims to pay Russian invoices through Kaspi Pay":



67.    The Report then included a screenshot under the heading "[s]eller claims that orders are 'mostly' going to Russian buyers":

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS



68.    The Report then included a screenshot under the heading "Kaspi seller claims to buy from Russian suppliers":



69.    The Report included a screenshot from the same seller as above, showing that "that same Kaspi seller offers a paid course on how to find Russian suppliers":

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS



**Example 4: that same Kaspi seller offers a paid course on how to find Russian suppliers**

70. The Report further stated the following about Kaspi.kz's marketplace:

Similarly, Russian VC forums [state that] the Kaspi marketplace "has been available to Russian suppliers since 2020" and "provides the most comfortable conditions for Russian suppliers."

(Italicization in original).

71. In the Report, Culper further revealed the following regarding Russian businesses selling on Kaspi.kz's marketplace, including Russian businesses with accounts at sanctioned Russian banks, and included the following screenshot (Example 6):

We also uncovered Russian businesses selling their own product through installment loans (i.e., Kaspi's BNPL product) on the Kaspi marketplace, as shown in the example of Saint Petersburg-based OxyProp below, *which*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*joined Kaspi in December 2023 according to their Kaspi storefront, and holds a bank account at VTB Bank, which has been subject to wide-ranging sanctions since February 2022. Kaspi again claims to have no relationships with Russian banks.*



(Emphasis added).

72.    The Report further stated that "[n]umerous Russian goods also appear to be offered for sale on Kaspi's marketplace. *See per our search below that when we set our location to Almaty, Kazakhstan, 13% of listings mention Russia, often in the context of the item's nation of origin*." (Emphasis added). The Report then included the following screenshots:



27



See for example a cookware set and gold jewelry each being sold from Russia via Kaspi. Photos by the seller tout the quality of the jewelry as hailing from a factory in Bronnitsy, Russia.

73.    The Report further stated the following about several "additional deals that Kaspi has made with Russian businesses, again in direct contradiction to the Company's assurances made in SEC filings":

- In May 2024, Kaspi formed an ***agreement to integrate Kaspi QR Pay with Smartix, a Russian self-checkout operator***. However, Kaspi looks to have hidden this deal from US investors – the Company never issued a press release or disclosed the deal, even as Kaspi issued a press release for what appears to be a very similar deal with AliPay+ made less than a month earlier.

- In 2021, Kaspi launched its "Postomat" automated parcel machines ("APMs"). Kaspi now has over 6,000 of these machines, which the Company touts as "a competitive advantage" and are now responsible for delivering of over 50% of e-commerce orders. ***However, we uncovered the supplier of these machines is again a Russian company, Techline, which proudly touts the machines as manufactured in Novosibirsk***.

- Kaspi also ***partners with Russia-based Yandex. Taxi for marketplace and grocery deliveries, according to a former Kaspi employee***. In 2022, Estonia banned Yandex. Taxi and encouraged others to do the same, citing concerns that user data is shared with the Kremlin.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- Finally, Kaspi even uses a Russian PR agency, Contextual Technologies, the same PR agency that represents numerous Kremlin/state-backed groups such as the Bank of Russia. It's unclear to us how or why Kaspi couldn't find a similar Kazakh PR agency to do the trick.

(Emphasis added).

74. The Report stated that "[a]ccording to a former Product Manager at Kaspi, the *Company also utilizes the Russian tech giant Yandex in order to fulfill deliveries*, and this relationship is what enables Kaspi to have held share amid competition from Ozon and Wildberries." (Emphasis added). It quoted the former Product Manager as saying the following:

[Kaspi is connected to the Yandex. So, as sellers, they get the IP of Yandex, And whenever you want to have an express delivery, for example, you might get it within three hours, even less. So, I really use it often when I really need some quick item. And it is not that expensive, and it is a really handy stuff to use it. So, for now Kaspi is the number one marketplace within the Kazakhstani market because there are a lot of competitors right now … So, every seller, they have the opportunity to connect to the Yandex IP for the quick delivery."]

75. The Report stated the following about Yandex, as background information:

Yandex has also come under scrutiny in the face of war. In March 2022, Estonia banned Yandex.Taxi, and encouraged other EU nations to do the same, *citing that user data was being shared with the Kremlin.*

Moreover, while Yandex had been public in the US since June 2011, in February 2022, NASDAQ suspended trading in Yandex and a number of other Russian US-listed ADSs, and in March 2023, [NASDAQ] told the firms they planned to delist the stocks. Yandex won its appeal of the delisting, but shares remain halted (now renamed Nebius NV) pending the divesture of all of the Company's Russian assets.

(Emphasis added).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

76.    The Report contained the following information about Kaspi.kz's partnership with Smartix under the heading "Kaspi Partners with Russian Self-Checkout Operator on QR pay, Never Discloses Deal to Investors":

> **In May 2024, Kaspi and Russian self-service checkout operator Smartix formed an agreement to integrate Kaspi QR into Smartix terminals. All of Smartix's disclosed self-checkout customers are Russian businesses**: FC Lokomotiv (the Russian Premier League football team's merchandise store located in Moscow), Karo (a Russian cinema network), Materia (a clothing store located in the Russian city of Yoshkar-Ola), and the Barnaul Airport (again, in Russia). **However, while Smartix issued a press release for the deal, Kaspi never issued a press release of their own**, even though less than a month earlier, the Company issued a press release touting what appears to us to be a very similar partnership with Alipay in China. **This contrast again suggests to us that Kaspi continually takes strides to hide its numerous ties to Russia from US investors**.

(Emphasis added).

77.    The Report included the following screenshot from Smartix's press release:



78.    The Report revealed the following regarding the Company's smart lockers:

> In 2021, Kaspi launched its "Postomats" network of automated personal machines ("APMs"), otherwise known as parcel lockers, of which the Company now has over 6,000. The locker have been an integral part of Kaspi's marketplace business; CEO Lomtadze referred to them as a "significant competitive advantage" in the Company's April 2023 earnings call, and disclosed in its Q2 2024 conference call that the lockers are now

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

responsible for over 50% of e-commerce deliveries. ***However, we once again uncovered the supplier of Kaspi's postomats is a Russian company, Techline, which manufactured the machines in Novosibirsk (Russia)***[.]

(Emphasis added).

79.    The Report then included the following screenshot from Techline, the Russian company mentioned above:



80.    Culper stated that its "research into Kaspi's M&A exposes not only a pattern of self-dealing, but the Company's myriad ties to bad actors. Kaspi is regarded by US investors as a high quality operation, yet the Company's proclivity for self-enrichment and choice of partners [continually demonstrates the opposite]." The Report then listed the following partners, revealing undisclosed related party transactions and links with reputed criminals:

- Kaspi's LSE listing was prefaced with a series of transactions between Chairman [Vyacheslav] Kim and the aforementioned former 30% shareholder Kairat Satybaldy that resulted in Satybaldy's ultimate removal from the Company's shareholder roster. ***In our view, these transactions***

***appear like they were designed primarily to hide Satybaldy's involvement in order to make Kaspi's London IPO more palatable to investors***. We see Kaspi as employing a similar tactic when choosing not to disclose the true extent of its exposure to Russia ahead of its 2024 US IPO.

- In February 2023, Kaspi formed a $155 million joint venture with Magnum Cash & Carry, one of Kazakhstan's largest supermarket chains with ties to Kenes Rakishev, the founder of now collapsed Net Element (NETE)[. . .][.] Kaspi discloses that Chairman [Vyacheslav] Kim holds a controlling stake in Magnum, yet Magnum's minority owners remain undisclosed, raising questions of who might still remain lurking behind the scenes. ***Russian language filings also reveal that Chairman Kim's daughter is affiliated with the venture, despite her name never appearing in SEC filings, again raising related party disclosure concerns***.

- In October 2021, Kaspi acquired Portmone, a Ukraine-based online payments group that Kaspi disclosed was not even considered an operating business at the time. ***Our review of Ukrainian and Cypriot filings reveals Portmone's administrator as Pampina Votsi of the infamous Vassiliades & Co – a longstanding front for Russian mobsters and sanctioned oligarchs***, including, for example, one oligarch responsible for "weapons trafficking, contract murders, extortion, drug trafficking, and prostitution on an international scale" according to his FBI most wanted poster. In August 2023, the Vassiliades network was placed on US and UK sanctions lists, and in October 2023, Russia reportedly issued an arrest warrant for Vassiliades on allegations of "large scale money laundering." As mentioned, Portmone was effectively a shell, but intended to partner with Ukraine's Concordbank to develop a mobile POS system. Yet these plans fell through, as in August 2023, the National Bank of Ukraine revoked Concord's banking license and liquidated the bank after previously accosting the bank for "failing to take adequate countermeasures to prevent money laundering and terrorist financing." Today, Kaspi still says it hopes to launch products in Ukraine "when the geopolitical situation stabilizes."

\*      \*      \*

- Finally in 2015, Kaspi Chairman Vyacheslav Kim acquired ALSECO JSC, a digital payments platform that claims to work with Kaspi and at least 8 other banks to allow users to pay multiple bills in a single interface. Kaspi Deputy Chairman Yuri Didenko is also reported to have been chairman of

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Alseco, and yet despite these multiple apparent entanglements, Kaspi once again never discloses Alseco in its SEC filings. ***Moreover, our research shows Kim acquired Alseco from Kairat Boranbayev and a secretive Swiss entity, Global Conformity AG. For his part, Boranbayev was considered a part of Nazarbayev's inner circle, and in March 2023 was sentenced to 8 years in prison for his embezzlement of public sector funds. Global Conformity's ultimate beneficiaries aren't disclosed in filings, in contravention of IAS standards***.

(Emphasis added).

81.    The Report further stated the following about Magnum Cash & Carry:

In February 2023, Kaspi formed a $155 million joint venture ("JV") with Magnum Cash & Carry, one of Kazakhstan's largest supermarket chains. Kaspi holds 90% of the JV, while Magnum holds just 10%. ***Our research into the deal uncovered both ties to bad actors and related party questions***.

(Emphasis added).

82.    The Report further stated that "Magnum was founded in 2008 and began operating in February 2009. Kaspi's Kazakh filings show that as of October 2016, Magnum was controlled by its founder Alexander Garber and Kenes Rakishev's SDB Group." In addition, "Rakishev has close ties to Kazakhstan's former dictator Nazarbayev, having obtained a stake in BTA Bank after its nationalization by Nazarbayev."

83.    The Report further stated the following about how Kaspi's Chairman had acquired part of Magnum Cash & Carry in his personal capacity:

In May 2017, Kaspi Chairman Kim acquired 35% of Magnum Cash & Carry as a personal investment, rather than on behalf of Kaspi, the majority of which was acquired from Rakishev. While Magnum's full ownership structure remains unclear, by September 2020, Kazakh media reports suggested that Magnum's co-founder Alexander Garber completely exited Magnum, and the only named shareholder was "Caspian Trading Investment Co. Ltd. LLP", which is listed in Russian language filings as an affiliate of Kaspi.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

84.     The Report stated the following about Chairman Kim's daughter, Yulia Vyacheslava Kim, and her role at Magnum E-Commerce, and included the following image:

> In June 2021, Magnum launched Magnum E-Commerce, and Kaspi launched Kaspi e-Grocery in partnership with Magnum. In February 2023, Kaspi disclosed that it acquired 90.01% of Magnum E-Commerce, with the remaining 9.99% to be held by Magnum Cash & Carry.
>
> Chairman Kim's daughter Yulia Vyacheslava Kim appears to run the venture; her name appears in KASE filings as an affiliate of Kaspi as of February 2023. Kaspi never discloses her role in US SEC filings.



85.     The Report stated, in sum, the following about Kaspi.kz's disclosures regarding Magnum Cash & Carry:

> [Kaspi's January 2024 US prospectus claimed that "Mr. Vyacheslav Kim, the chairman of our board of directors and a significant shareholder, is the beneficial owner of a controlling stake in Magnum Cash & Carry" yet the full roster of Magnum's beneficial owners remains a mystery, *as it is unclear if Kim controls his stake in Magnum via Caspian Trading Investment, which was earlier listed as the sole shareholder of Magnum, or if Caspian Trading Investment itself contains other unnamed non-controlling shareholders*.]

(Emphasis added).

86.     The Report further stated that Culper "believe[d] Kaspi's transformation from a typical retail bank into Kazakhstan's largest fintech owes in large part to the Company's relationship with ALSECO JSC ("Alseco"), *which Chairman Kim purchased in 2015, yet remains undisclosed in all of Kaspi's SEC filings, leaving us with yet another set of related party questions*." (Emphasis added).

87.     The Report stated the following about Alseco:

Alseco is known in Kazakhstan for digitizing, automating, and consolidating utility bills (power, water, gas, and phone). In 2015, Kaspi Chairman Vyacheslav Kim and CEO Mikhail Lomtadze reportedly acquired 90% of Alseco for an undisclosed sum. Alseco's 2015 filings disclosed Kim as the owner of 90% of shares, and Alseco founder Oleg Vlasov as the remaining 10% owner; it is unclear to us if Kim acted as a proxy for Lomtadze.

88.     The Report then included the following image:

По состоянию на 31 декабря 2015 года акционерами Компании являлись физические лица: Ким Вячеслав Константинович (90% от общего числа акции Компании) и Власов Олег Александрович (10%).

*"As of December 31, 2015, the shareholders of the Company were individuals: Kim Vyacheslav Konstantinovich (90% of the total number of Company shares) and Vlasov Oleg Aleksandrovich (10%)."*

89.     The Report noted that "[f]ilings reveal that ***75% of Kim's purchase of Alseco was from resources and real estate oligarch Kairat Boranbayev and a Swiss-registered entity [called] Global Conformity AG***." (Emphasis added). The Report then said the following about Kairat Boranbayev and Global Conformity AG:

-       Boranbayev was part of the dictator Nursultan Nazarbayev's inner circle: his daughter married Nazarbayev's grandson in 2013, while he was also reportedly a partner in corrupt business dealings with the dictator's son in law[.] ***In March 2022, Boranbayev was arrested on charges of embezzling quasi-public sector funds. In March 2023, he was sentenced to eight years in prison for corruption and has so far forfeited at least $195 million in assets to the state***.

-       Global Conformity AG, equal owner of the stake sold to Kim, is registered in Switzerland and represented by nominee director Kay Hoffman[.] He is owner and chairman of corporate services company Intrust AG, which markets "[wealth management services to international clients.]" Global Conformity's ultimate beneficiaries aren't disclosed in Swiss filings, ***while Kazakh filings note that this non-disclosure runs in contravention of IAS accounting***.

(Emphasis added).

90.     The Report further stated the following about Deputy Chairman Yuri Didenko:

In addition to Kim's controlling stake, Kaspi's Deputy Chairman Yuri Didenko is reported to have been Chairman of Alseco since 2015. [. . .].

***Alseco now works with Kaspi and at least 8 other banks to allow users to access and pay bills in a single interface***. Alseco also provides data management for Kazakh tax agencies and debt collectors, and has claimed that its work with the Kazakh government "would not have been possible" without the participation of "pioneer banks" including Kaspi.

*     *     *

Meanwhile, Kaspi's bill payments have become a critical piece of its business; Kaspi even promotes it as *"our main customer acquisition tool"* and *"fundamental for high levels of customer engagement."*(Italicization in original). Bill pay is also the second-most utilized Kaspi offering, at 83% of MAUs.

***Yet despite these multiple entanglements, Kaspi never discloses Alseco as a related part in its SEC filings, or even mentions the group once***.

(Emphasis added).

91.     The Report stated the following about Kaspi.kz's acquisition of Portmone, which it characterized as a "***ShellCo seemingly tied to Russian mobsters***." (Emphasis added).

92.     The Report notes that "Kaspi's filings reveal the deal was accounted for as an asset acquisition in contrast to an operating business as, '*the Group did not acquire any substantive processes or activities that would constitute a business*.'" (Italicization in original).

93.     In response, the Report stated the following about Portmone:

Portmone had just partnered with Ukraine-based Concordbank, intending to create a mobile POS payments system. However, after Kaspi acquired

36

Portmone, the National Bank of Ukraine in June 2022 issued a warning and fine to ConcordBank for "*failing to take adequate countermeasures to prevent money laundering and terrorist financing*." [(Emphasis added)].In August 2023, ConcordBank's banking license was revoked and the bank was liquidated. Today, Kaspi continues to characterize the acquisition as a foothold in Ukraine, stating in its 2023 Form 20-F that, *"[a]lthough the business is small, Portmone's payment license gives us the ability to launch other payments and related products, when the geopolitical situation stabilizes*[."] [(italicization in original)] ***However, it is not only Portmone's operational history that raises red flags, but its own ownership history, as our due diligence reveals that Kaspi purchased the business from reputed proxies for Russian mobsters***. (Emphasis added).

94.     The Report then stated the following:

Portmone LLC was incorporated in Ukraine in 2002, and in 2013 was acquired by Ukraine-based Dragon Capital. In 2016, Dragon spun out a new firm – 4i Capital Partners – which assumed control of Portmone at that time, per Ukrainian records. Cyprus-based corporate filings reveal Portmone's majority shareholder from at least November 2013 to June 2023 – well after Kaspi's acquisition of the business – was Budus Investments Ltd[.] Budus in turn lists a single director – Pampina Votsi, a corporate administrator at Cypriot law firm Christodoulos G Vassiliades & Co. ***It's thus impossible for us to determine the exact individual or individuals from whom Kaspi purchased Portmone, yet it remains highly concerning to us that both Votsi and Vassiliadis are alleged to have run business operations for Russian mobsters and sanctioned oligarchs***.

(Emphasis added).

95.     The Report further stated the following:

As early as 2017, ***Votsi was accused of acting as a front for Ukrainian-Russian mobster*** Semion Mogilevich, who had been on the FBI's most wanted list for his part in defrauding investors in a Canadian-U.S. listed company and for crimes including, per FBI agents, ***"weapons trafficking, contract murders, extortion, drug trafficking, and prostitution on an international scale."***

(Emphasis added).

96.    The Report further stated the following about Votsi:

Votsi is also named as a director of companies owned by sanctioned Dagestani-Russian oligarch Suleiman Kerimov, and is named in filings for numerous other sanctioned entities including Gurbax Holdings Limited linked to Alexander Lebedev, and Delesius Investments, linked to Alisher Usmanov. In 2020, Vassiliades was described as *"probably the law firm that has had the closest ties to the Kremlin",* per a report published by Sofia-based think-tank The Center for the Study of Democracy. In March 2022, the Financial Times penned a report detailing the "opaque ownership structures" of the assets of sanctioned Russian oligarchs, noting further ties back to Votsi and Vassiliades. The law firm claimed to FT that *"[t]here is no substance to the innuendo that our firm 'has the closest ties to the Kremlin ...[']"*

However, in August 2023, Vassiliades was placed on the OFAC and UK sanctions lists for having "*knowingly assisted sanctioned Russia oligarchs to hide their assets in complex financial networks."* In October 2023, Russia itself reportedly issued an arrest warrant for Vassiliades on allegations of *"large scale money laundering."*

(Italicization in original).

97.    The Report stated the following regarding Kaspi.kz's choice of PR agency:

Kaspi has even relied on the services of Contextual Technologies, a Russian PR agency that represents numerous other Russian state groups, as shown in the photo below. ***In fact, every one of Contextual's disclosed clients is a Russian company or Russian state-owned asset, with the exception of Kaspi***.

(Emphasis added).

98.    The Report then included the following photo, showing Kaspi as a listed client of Contextual Technologies:

38

99.    The Report stated that "[i]t seems particularly strange to us that Kaspi would engage a Russian PR agency when, presumable, plenty of Kazakh PR agencies would be perfectly capable of doing the job just as well."

100.    On this news, the price of Kaspi.kz ADS' fell by $19.82 per ADS, or 16.1%, to close at $99.81 per ADS on September 19, 2024, and a further $2.71 per ADS, or 2.7%, to close at $97.10 per ADS on September 20, 2024.

101.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

102.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

103.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were

39

actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

104. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

106. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

107. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

108. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

109.   Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

110.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

111.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

113.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

42

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

115. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

116. Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

117. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class

43

relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

118. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

119. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

120. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

121. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

122. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

123. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

124. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

125. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(c)     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 19, 2024            **THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS